1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DEBBIE J. WILLIAMS,

Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

Defendant.

CASE NO.     C07-5162RJB-KLS

REPORT AND
RECOMMENDATION

Noted for April 4, 2008

Plaintiff, Debbie J. Williams, has brought this matter for judicial review of the denial of her

applications for disability insurance and supplemental security income ("SSI") benefits.  This matter has

been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local

Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261

(1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the

following Report and Recommendation for the Honorable Robert J. Bryan's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 37 years old.[1] Tr. 24.  She has a high school education and past work

experience as a newspaper deliverer, telephone salesperson, waitress, cashier, circuit board worker,

administrative assistant, file clerk, and office assistant. Tr. 20, 76, 83.

---

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

On September 27, 2004, plaintiff filed applications for disability insurance and SSI benefits, alleging disability as of October 1, 2002. Tr. 14, 51-53. 392-93.  Her applications were denied initially and on reconsideration. Tr. 14, 24-26, 31, 394-96.  A hearing was held before an administrative law judge ("ALJ") on March 23, 2006, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 410-43.

On August 10, 2006, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1)     at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability;

(2)     at step two, plaintiff had "severe" impairments consisting of a bipolar affective disorder, obesity, fibromyalgia, hypothyroidism, and asthma;

(3)     at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)     at step four, plaintiff had the residual functional capacity to perform a modified range of light work, with certain other non-exertional limitations, which precluded her from performing her past relevant work; and

(5)     at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 14-22.  Plaintiff's request for review was denied by the Appeals Council on February 16, 2007, making the ALJ's decision the Commissioner's final decision. Tr. 6; 20 C.F.R. § 404.981, § 416.1481.

On April 2, 2007, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3).  The administrative record was filed with the Court on June 17, 2008. (Dkt. #10)  Plaintiff argues the ALJ's decision should be reversed and remanded to the Commissioner for an award of benefits or, in the alternative, for further administrative proceedings, for the following reasons:

(a)     the ALJ erred in evaluating the medical evidence in the record;

(b)     the ALJ erred in finding that plaintiff's mental impairments did not meet or equal the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04;

(c)     the ALJ erred in assessing plaintiff's credibility;

(d)     the ALJ erred in evaluating the lay witness evidence in the record;

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

REPORT AND RECOMMENDATION
Page - 2

1

(e)     the ALJ erred in assessing plaintiff's residual functional capacity; and

2

(f)     the ALJ erred in finding plaintiff capable of performing other jobs existing in significant numbers in the national economy.

3

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set

4

forth below, recommends that while the ALJ's decision should be reversed, this matter should be

5

remanded to the Commissioner for further administrative proceedings. Although plaintiff requests oral

6

argument in this matter, the undersigned finds such argument to be unnecessary here.

7

DISCUSSION

8

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the

9

Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole

10

to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is

11

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson

12

v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than

13

a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir.

14

1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than

15

one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749

16

F.2d 577, 579 (9th Cir. 1984).

17

I.      The ALJ's Evaluation of the Medical Evidence in the Record

18

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

19

medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in

20

the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions

21

of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion

22

must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th

23

Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact

24

inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

25

"falls within this responsibility." Id. at 603.

26

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

27

supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a

28

detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

1  thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the

2  evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences

3  from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

4  The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

5  either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

6  treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific

7  and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However,

8  the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler,

9  739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only

10  explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d

11  700, 706-07 (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

12  In general, more weight is given to a treating physician's opinion than to the opinions of those who

13  do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

14  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings"

15  or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190,

16  1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242

17  F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

18  opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion

19  may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id.

20  at 830-31; Tonapetyan, 242 F.3d at 1149.

21  A.  Ms. Paulus

22  In late February 2006, Vicki D. Paulus, a registered nurse practitioner who had treated plaintiff for

23  her bipolar disorder since early October 2003, wrote a letter in which she opined in relevant part that:

24  . . . Debbie has tried and failed multiple medications in an attempt to control her
Bipolar symptoms.  Debbie has been unable to remain stable for any significant length
of Time [sic] since I have been treating her.

25  Debbie's symptoms are not limited to, but include severe fluctuations in mood
from deep depression to hypomania, tearfulness, irritability, lethargy, sleep disturbance,

26  difficulty with cognition, including poor concentration, difficulty processing
information and memory.  At times, she becomes very isolative and stays in bed for

27  days due to depressive symptoms.  Debbie has experienced panic attacks at times of
stress, with a high level of worry most days.

28  Currently, Debbie is taking Paxil 30mg per day and Neurontin 1200mg twice

1   daily.  These medications minimize Debbie's symptoms but it is difficult for to her [sic]
2   function on a daily basis.  Debbie is unable to cope effectively with stress and in my
    opinion in [sic] fully disabled and unable to work now or at any time.

3   Tr. 384.

4       With respect to Ms. Paulus's opinion, the ALJ found as follows:

5       . . . Ms. Paulus is not an acceptable medical source under the Social Security
6       Administration's regulations and her opinion is not consistent with her treatment notes.
        Although she states the claimant is unable to work "now or at any time", the claimant
7       worked at substantial gainful activity levels during much of the time she was seen by
        Ms. Paulus, in 2001 and 2002.  In July 2004 the claimant reported difficulty "doing it
8       all", working full-time and caring for her home and family (Exhibit 12F-126) but when
        seen a couple of weeks later she was doing better, with better mood and sleep (Exhibit
9       12F-127).  In October 2004 the claimant reported she was able to do daily activities and
        her mood was improving (Exhibit 12F-130).  In March and April 2005 she was
10      described as smiling and interacting appropriately (Exhibit 20F-236).  In June 2005 her
        mood stability was good (Exhibit 20F-238).  The opinion of Ms. Paulus regarding total
11      disability is not consistent with the treatment records and evidence regarding claimant's
        daily activities.  The opinion is given little weight because of that.

12  Tr. 19.

13      Plaintiff first argues the fact that Ms. Paulus is not an "acceptable medical source" is an improper

14  basis on which to reject her opinion.  The undersigned agrees.  It is true that a nurse practitioner, is not an

15  "acceptable medical source" as that term is defined in the Social Security Regulations, and thus may be

16  given less weight than those of acceptable medical sources.  See Gomez v. Chater, 74 F.3d 967, 970-71

17  (9th Cir. 1996); 20 C.F.R. § 404.1513(a), (d), § 416.913(a), (d) (acceptable medical sources include

18  licensed physicians, not nurse practitioners).  Evidence from "other sources," including other "medical

19  sources" such as nurse practitioners, however, may be used to "show the severity" of a claimant's

20  impairments and their effect on the claimant's ability to work.  20 C.F.R. § 404.1513(d), § 416.913(d).

21      While the Social Security Regulations "provide specific criteria for evaluating medical opinions

22  from 'acceptable medical sources'; . . . they do not explicitly address how to consider relevant opinions

23  and other evidence from" other medical sources listed in 20 C.F.R. § 404.1513(d) and 20 C.F.R. §

24  416.913(d). Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 *3; 20 C.F.R. § 404.1527(a), (d), §

25  416.927(a), (d).[3]  SSR 06-03p was issued on August 9, 2006, however, for the purpose of clarifying how

26

27      [3]The specific criteria for evaluating the opinions of acceptable medical sources include the following:

28      • The examining relationship between the individual and the "acceptable medical source";
        • The treatment relationship between the individual and a treating source, including its length, nature, and
        extent as well as frequency of examination;

opinions from such other medical sources will be considered:

> . . . With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file. . . .

Although 20 CFR 404.1527 and 416.927 do not address explicitly how to evaluate evidence (including opinions) from "other sources," they do require consideration of such evidence when evaluating an "acceptable medical source's" opinion. For example, SSA's [Social Security Administration's] regulations include a provision that requires adjudicators to consider any other factors brought to our attention, or of which we are aware, which tend to support or contradict a medical opinion. Information, including opinions, from "other sources"-both medical sources and "non-medical sources"-can be important in this regard. . . .

As set forth in regulations at 20 CFR 404.1527(b) and 416.927(b), we consider all relevant evidence in the case record when we make a determination or decision about whether the individual is disabled. Evidence includes, but is not limited to, opinion evidence from "acceptable medical sources," medical sources who are not "acceptable medical sources," and "non-medical sources" who have seen the individual in their professional capacity. The weight to which such evidence may be entitled will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors . . .

Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:
> • How long the source has known and how frequently the source has seen the individual;
> • How consistent the opinion is with other evidence;
> • The degree to which the source presents relevant evidence to support an opinion;
> • How well the source explains the opinion;

---

• The degree to which the "acceptable medical source" presents an explanation and relevant evidence to support an opinion, particularly medical signs and laboratory findings;
• How consistent the medical opinion is with the record as a whole;
• Whether the opinion is from an "acceptable medical source" who is a specialist and is about medical issues related to his or her area of specialty; and
• Any other factors brought to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an "acceptable medical source" has, regardless of the source of that understanding, and the extent to which an "acceptable medical source" is familiar with the other information in the case record, are all relevant factors that we will consider in deciding the weight to give to a medical opinion.

SSR 06-03p, 2006 WL 2329939 *2-*3; 20 C.F.R. § 404.1527(d), § 416.927(d).

REPORT AND RECOMMENDATION
Page - 6

• Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
• Any other factors that tend to support or refute the opinion. . . .

Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions.

Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because . . . "acceptable medical sources" "are the most qualified health care professionals." However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p, "Titles II and XVI: Giving Controlling Weight To Treating Source Medical Opinions."

SSR 06-03p, 2006 WL 2329939 *3-*5.

Plaintiff argues the ALJ failed to take the factors set forth in SSR 06-03p into account in rejecting Ms. Paulus' opinion on the basis that she was not an "acceptable medical source." The undersigned agrees that in light of the language in SSR 06-03p, it is improper to reject a medical opinion solely because it does not come from an acceptable medical source. Rather, as plaintiff argues, the ALJ must take into account all of the factors noted above for determining the weight to be given thereto. However, the undersigned further notes – and plaintiff herself points out – that SSR 06-03p was issued just one day prior to the date on which the ALJ issued her decision. As such, it is not clear that the ALJ was fully aware of the factors now required to be considered in evaluating non-acceptable medical source opinions under SSR 06-03p. Accordingly, remand to allow for such consideration is appropriate here, particularly in light of the other reasons, discussed below, the undersigned has found require remand as well.[4]

---

[4]Even if the ALJ was aware of the existence of SSR 06-03p at the time she issued her decision, furthermore, remand would still be appropriate as no analysis of the factors set forth therein was conducted by the ALJ, and thus the Court is unable to determine whether that analysis was correct. Nor is it clear those factors dictate adoption of Ms. Paulus's opinion in this case.

REPORT AND RECOMMENDATION
Page - 7

Plaintiff next argues the ALJ selectively chose from the record in finding Ms. Paulus's opinion was not consistent with her treatment notes. As support for this argument, plaintiff cites to some of those notes showing she was doing worse. See Tr. 264-65, 389. As found by the ALJ, however, the great majority of the treatment notes from Ms. Paulus over the period during which she treated plaintiff do show symptom and mental functional improvement. See Tr. 262, 266-72, 274-77, 280, 386-88, 390-91. Indeed, even in the same progress notes plaintiff points to as indicating a worsening of symptoms, improvement was noted there as well. See Tr. 264-65. The undersigned thus finds no error on the part of the ALJ here.

Plaintiff takes issue with the ALJ's finding that Ms. Paulus's opinion – that plaintiff was unable to work "now or at any time" – was contradicted by the fact that plaintiff had worked at substantial gainful activity levels for much of the time during the years 2001 and 2002, and for three months in 2004. Tr. 19, 415-17. Plaintiff argues there is no contradiction here, as Ms. Paulus was describing her ability to work at the time the opinion was provided and prospectively, and was not opining as to plaintiff's ability to work in the past. The undersigned agrees that Ms. Paulus was not necessarily stating that plaintiff was "never" able to work. However, it certainly is possible to interpret the phrase "or at any time" as referring to the past as well. Indeed, Ms. Paulus also opined at the same time that plaintiff had been "unable to remain stable" for any significant length of time since having begun treating her. Tr. 384. Taken all together, it thus was not wholly unreasonable for the ALJ to have found as she did here. Nevertheless, because this matter should be remanded for the other reasons stated herein, this issue should be re-considered as well.

Lastly, plaintiff challenges the ALJ's determination that Ms. Paulus's opinion was inconsistent with plaintiff's daily activities. Specifically, plaintiff argues the ALJ failed to identify which activities of daily living he found to be inconsistent. The undersigned agrees. Although the extent of a claimant's activities of daily living may be a basis for calling into question a non-acceptable medical source's opinion, the ALJ must identify which such activities form that basis to allow for meaningful judicial review. The ALJ did not do that here, and to that extent she erred. Accordingly, in light of the discussion above, remand to the Commissioner for re-consideration of Ms. Paulus's opinion is proper.

B.   Dr. McVay

In late November 2004, plaintiff was evaluated by Elice McVay, Ph.D., who diagnosed her with a rapid cycling bipolar disorder, with features of post traumatic stress disorder and past psychotic features,

and an estimated global assessment of functioning ("GAF") score of 30 to 60. Tr. 251.  Psychological

testing indicated plaintiff was in the average to high average range for memory and the "average to good"

range for concentration. Tr. 248, 251.  There was no evidence of psychomotor agitation or retardation or of

current delusions or hallucinations on mental status examination. Tr. 250.  While plaintiff admitted that

she still thought of suicide, she did not expect to act on those feelings. Id.

Plaintiff's speech was "fairly normal," although "a little over-detailed and rapid," and her mood

was "almost even but a little low." Id.  She was oriented, able to follow a simple three-step command, and

seemed capable of following the conversation. Id.  In addition, plaintiff's abstract reasoning ability was

thought to possibly be "grossly intact." Id.  It was further felt, however, that her judgment might be "a little

impaired." Id.  In terms of prognosis, Dr. McVay opined as follows:

> . . . She has a history of her condition being exacerbated by stress including attempts at
> work.  Bipolar Disorder is a chronic condition which is made worse by stress;
> therefore, stress should be limited in her case in order to manage it.  Mrs. Williams is
> seeing [sic] medications prescriber and has recently reentered counseling which should
> be helpful in the management of her condition.  She appears to have some features of
> Posttraumatic Stress Disorder, which flare up when triggered.  This condition will
> contribute to the overall stress which Mrs. Williams experiences and likely complicate
> [sic] management of her Bipolar Disorder.

Tr. 252.  Dr. McVay also did not think that plaintiff was "appropriate to manage her own funds," and gave

the following further statement regarding her mental functioning:

> Mrs. Williams appeared fairly well functioning at the interview.  There was some
> indication that she might be experiencing some mild depressed and manic symptoms
> and mild concentration difficulties at the time of the interview.  However, she readily
> admitted that she was in a relatively rare period of fairly level mood at the time of the
> testing and appeared to try her best on the test thus producing an average profile which
> is probably optimal for her.  My concern, however, is that Mrs. Williams describes a
> history of rapid cycling and severe bipolar symptoms.  Based on her history, her
> symptoms regularly worsen (especially when working) and then appear to be quite
> limiting.  Her history and diagnosis can be confirmed through the records of Vicki
> Paulus NP who has reportedly worked with Mrs. Williams for some time.  If confirmed,
> I would expect someone with Mrs. Williams' profile to have severe difficulties with
> concentration and adaptation frequently enough, that it would severely impair her
> ability to hold any job.

Id.

The ALJ found Dr. McVay's opinion to be "not consistent with" her "findings on examination or

with treatment records, and because of that" gave it "little weight." Tr. 19.  Specifically, the ALJ found

that plaintiff's mental status examination had been good, and that Dr. McVay had reported that she

appeared to be "fairly well functioning in the interview." Id.  Plaintiff argues these are not valid reasons

for rejecting Dr. McVay's opinion, because the ability of a claimant with rapid cycling bipolar disorder to sustain work activity cannot assessed by an examining medical source based solely on the claimant's functioning on the day of evaluation.  The undersigned agrees.

Dr. McVay herself explained that her opinion was based both on plaintiff's functioning on the day of the evaluation and on her reported history.  Dr. McVay expressly noted that while plaintiff appeared to be functioning fairly well during the interview, her history suggested she did not do nearly as well at other times or when her symptoms worsened, which, per plaintiff's report, appeared to occur regularly.  Further, although, as discussed above, there is a question as whether the treatment records from Ms. Paulus actually show a worsening of symptoms over time, there is no indication the ALJ in fact compared those records with Dr. McVay's findings and opinion, as suggested by Dr. McVay.  Given this, and that it seems the ALJ may not have fully understood the nature of plaintiff's bipolar disorder as described by Dr. McVay and Ms. Paulus, once more remand for re-consideration of the medical evidence here is proper.

C.   Dr. Magaret

Plaintiff was examined by Nathan Magaret, M.D., in late January 2005.  Plaintiff was observed to be "well-appearing" and "in no acute distress." Tr. 257.  She walked "without a limp" and without a need for an assistive device, could walk on her toes and heels, and had a normal gait. Tr. 258.  Plaintiff did have "some diffuse areas of trigger point tenderness which fit with the classic fibromyalgia trigger points" in the area of her spine, shoulders, buttocks and thighs. Tr. 258.  Further, her trigger points were "hypersthenic where just light touch to the skin" caused "significant pain." Id.  Plaintiff, however, had normal strength in all of her extremities, normal muscle bulk and tone, and, except with respect to the above-noted areas of "hypersensitivity" – which gave "the impression of causing significant pain and muscle spasm" – normal sensation to light touch. Tr. 259.

Dr. Magaret diagnosed plaintiff with "[p]robable fibromyalgia," stating further that:

. . . She does have some of the classic features, including trigger point tenderness. However, her symptoms area [sic] little unusual with light touch and skin hyperesthesia being the exacerbating causes.  She does describe this being quite debilitating to her, but the remainder of her examination was very reassuring.  There is no evidence of neurologic or motor compromise.

Id.  In terms of functional assessment, Dr. Magaret went on to opine:

. . . Based on history and exam, the number of hours the claimant should be expected to stand and walk in an eight-hour day would be about six hours with more frequent than

usual breaks.  As described today, her examination today does have components that fit with diagnosis of fibromyalgia in addition to her depression.  It is felt that working longer than six hours would be difficult for her.  The number of hours the claimant could be expected to sit in an eight-hour workday is again six hours.  Again, I think that her likely fibromyalgia would limit her to six hours in a workday.  She does not need any assistive devices.

The amount of weight the claimant could lift and carry frequently would be 20 pounds and occasionally 40 pounds.  Again, she is limited by fibromyalgia, but I found no significant strength or motor deficits on neurologic examination.

She has no postural limitations, manipulative limitations, and no relevant visual, communicative, or workplace environmental limitations.

Id.

The ALJ addressed Dr. Magaret's findings and opinion as follows:

Dr. Magaret spent only 25 minutes with the claimant and his examination revealed few objective findings.  His assessment that the claimant can work only 6 hours appears to be based on the claimant's subjective complaints.  However, the claimant's pain complaints are not fully credible.  The claimant has sought little treatment for fibromyalgia in recent years.  In February 2005 she reported Flexeril was working well (Exhibit 13F-146).  Prior to this visit she had not been seen for complaints of pain since December 2003.  Her minimal treatment and extensive daily activities are not consistent with her allegations of debilitating pain.  The opinion of Dr. Magaret is given little weight because it is based on a one-time examination and is not consistent with the treatment records and evidence of claimant's daily activities.

Tr. 20.  Plaintiff argues the fact that she was seen only one time for 25 minutes is not a legitimate reason for rejecting Dr. Magaret's opinion.  The undersigned agrees.  While 25 minutes may be brief, the ALJ has not pointed to any evidence that this was an insufficient period of time for Dr. Magaret to form an opinion regarding plaintiff's ability to function.  The fact that Dr. Magaret only saw plaintiff one time also is not a legitimate basis for rejecting his opinion, as most examining medical sources only see claimants one time, and the Commissioner often has relied on such one-time opinions in the past.

Plaintiff next argues the ALJ also improperly rejected Dr. Magaret's opinion on the basis that it is supported by few objective findings.  The ALJ may not reject a diagnoses of fibromyalgia solely on the basis that it is not supported by objective medical evidence.  See Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004) (ALJ erred in discounting opinions of treating physicians by relying on his own disbelief of claimant's symptom testimony and misunderstanding of fibromyalgia).  It is thus improper to "effectively" require "'objective' evidence for a disease that eludes such measurement." Id. (citing Green-Younger v. Barnhart, 335 F.3d 99, 108 (2nd Cir. 2003)).  The undersigned therefore agrees that this stated basis for the ALJ's rejection of Dr. Magaret's opinion was improper.

1    Similarly, the undersigned agrees with plaintiff that the ALJ did not adequately explain how her

2    activities of daily living were inconsistent with Dr. Magaret's opinion.  On the other hand, the ALJ was not

3    remiss in discounting that opinion due to the medical evidence in the record showing minimal treatment

4    and the effectiveness of plaintiff's medication.  In early March 2002, for example, plaintiff reported that

5    she was "doing reasonably well," and that the medication she was taking, Flexiril, "helped significantly

6    with her sleep." Tr. 181.  Thus, "[o]verall," it was felt she was "showing some signs of improvement." Id.

7    In early April 2002, plaintiff reported that she was "now taking more care of herself and her family," that

8    she felt "good" and that she had "really no complaints." Tr. 199.

9    While plaintiff did not feel Flexeril was controlling her pain in late February 2005, she reported

10   that Motrin did seem to relieve it. Tr. 173.  In early May 2005, plaintiff was noted to be improving on

11   Flexiril. Tr. 217.  In late May 2005, she reported Flexiril was working well for the back spasms associated

12   with her fibromyalgia. Tr. 286.  In light of plaintiff's apparent improvement over time and the fact that she

13   seems to have done well on her fibromyalgia medication, the ALJ thus had at least some basis for calling

14   into question Dr. Magaret's opinion regarding work capability.  Given that this was the only valid reason

15   the ALJ provided for rejecting Dr. Magaret's opinion, and that this matter already is being remanded for

16   the other reasons noted herein, on remand this evidence should be re-considered as well.

17   Plaintiff further argues that the ALJ failed to acknowledge that Marcia Sparling, M.D., and Jennifer

18   J. Barlow, M.D., who examined plaintiff in late January 2002, and late April 2003, respectively, diagnosed

19   her with fibromyalgia. Tr. 184, 217.  Neither physician, though, found any specific work-related

20   limitations stemming from plaintiff's fibromyalgia.  That is, "[t]he mere existence of an impairment is

21   insufficient proof of a disability," let alone a decreased ability to work. Matthews v. Shalala, 10 F.3d 678,

22   680 (9th Cir. 1993).  As such, the undersigned finds no error on the part of the ALJ in failing to mention

23   the diagnoses of Drs. Sparling and Barlow in her evaluation of the findings and opinion of Dr. Magaret.

24        D.    Other Medical Evidence

25   Plaintiff argues the ALJ erred by failing to mention the fact that Dr. Sparling, who, as noted above,

26   examined her in late January 2002, gave a diagnosis of "fairly classic fibromyalgia with marked sleep

27   disruption and a significant exacerbating component with chronic depression and anxiety." Tr. 184.  Also

28   as discussed above, however, the mere existence of an impairment is insufficient proof of disability or of

work-related limitations.  In addition, while Dr. Sparling did note marked sleep disruption, she gave no opinion on what effect, if any, such disruption had on plaintiff's ability to work.  Indeed, she provided no opinion on work-related capabilities, and less than two months later noted that plaintiff reported significant improvement in her sleep. Tr. 181.  Accordingly, the undersigned finds no error here.

Similarly, the undersigned rejects plaintiff's assertion that the ALJ erred in failing to mention Dr. Barlow's late April 2003 notation that the medications plaintiff was taking for her bipolar disorder and fibromyalgia had caused her to gain weight, which had increased her depression. Tr. 217.  The mere fact that plaintiff's depression may have increased does not alone show that such an increase has impacted her ability to work in any meaningful way.  That is, plaintiff must show the increased depression resulted in actual work-related limitations.  She has not done so here.

Plaintiff further argues the ALJ should have mentioned each of the following as being significant probative evidence that supported her disability claim:

> On July 14, 2004, Ms. Paulus reported that Ms. Williams complained of feeling "more hyper, less need for sleep, can't shut mind off - lasted about one month." (Tr. 268). Ms. Paulus also reported that Ms. Williams "quit her job because she couldn't handle stressors." (Tr. 268).
>
> On September 3, 2004, Ms. Paulus wrote that Ms. Williams complained that her Paxil was not working and she was "feeling exhausted, numb emotionally, isolative, in bed for two days, 'I don't want to do anything.'" (Tr. 267).
>
> On September 10, 2004, Michael Stine, MS, CDMHP, described Ms. Williams as having taken a handful of Neurontin and Flexeril because "my muscles were hurting so bad that I just wanted to go to sleep." (Tr. 366).
>
> On September 30, 2004, Ms. Paulus wrote that Ms. Williams "reports anxiety being around a lot of people, feels overwhelmed." (Tr. 264-65).
>
> On October 27, 2004, Ms. Paulus wrote that Ms. Williams was complaining of mild sedation, and that she was cycling less rapidly. She was tearful, but not as overwhelmed. She was still feeling depressed, with decreased motivation. (Tr. 264). On December 9, 2004, Ms. Paulus reported that Ms. Williams "has her sleep routine switched – tired during day and awake during night." (Tr. 264).
>
> On January 12, 2005, Ms. Paulus wrote that Ms. Williams was complaining of "whole body tremors especially at night – reports she sleeps a lot due to depression, tearful, not functional," and that Ms. Williams appeared depressed, tearful, and lethargic. (Tr. 263). On January 17, 2005, Ms. Paulus wrote that Ms. Williams was complaining of extreme fatigue from the Depacote and tremors. (Tr. 262).
>
> On February 28, 2005, Jennifer Platz, PA-C, wrote that Ms. Williams was complaining of feeling very fatigued. (Tr. 286).
>
> On April 23, 2005, Linda Marshall, MSW, wrote that Ms. Williams was complaining of

depressed mood, hopelessness, fatigue, sleep problems, low self-esteem, muscle tension, and physical pain. (Tr. 380). Ms. Marshall also wrote that Ms. Williams believed she had a gambling problem. (Tr. 380).

On May 11, 2005, Ms. Paulus wrote that Ms. Williams complained that she couldn't work under her current circumstances. Ms. Paulus also wrote that she agreed that Ms. Williams "would not be able to work with severity of symptoms." (Tr. 389).

(Dkt. #16, Plaintiff's Opening Brief, pp. 17-18). The most this evidence shows, however, is what plaintiff allegedly reported to these medical sources. While such reports and statements by plaintiff may have some bearing on her own credibility, they fail to reveal any specific findings by the medical sources to whom she made those reports and statements regarding her work-related capabilities. The only real exception to this is the last statement made by Ms. Paulus, which, however, already has been dealt with above. Accordingly, the undersigned finds no error on the part of the ALJ here as well.

II.     The ALJ's Step Three Analysis

At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R § 404.1520(d), § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled. Id. The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the Listings. Tacket, 180 F.3d at 1098.

A mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508, § 416.908. It must be established by medical evidence "consisting of signs, symptoms, and laboratory findings." Id. An impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2. An impairment equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed impairment." Id. at *2. However, "symptoms alone" will not justify a finding of equivalence. Id.

As noted above, the ALJ found plaintiff's mental impairments did not meet or equal the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1. More specifically, the ALJ stated:

The claimant's physical impairments are not of sufficient severity to meet the criteria of any listed impairment.  Her mental impairments result in mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and there have been no extended episodes of decompensation of extended duration.  She functions independently, drives, and cares for her children.  She reports withdrawing from family and friends when depressed but there is no evidence of difficulties with routine types of social interaction.  She exhibits average to good concentration and working memory on psychological testing. (Exhibit 10F).  There is no evidence of extended episodes of decompensation.  Evidence does not establish the presence of the "C" criteria in the listings regarding mental conditions.  No physician has opined that the claimant's impairments are equal to a listed impairment.

Tr. 17.

Plaintiff argues she meets or equals Listing 12.04C.2[5], which reads as follows:

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: . . .

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate

Specifically, plaintiff asserts the opinion Ms. Paulus provided in late February 2006, supports a finding that she meets or equals this Listing.  In her opinion, Ms. Paulus stated that plaintiff had been "unable to remain stable" for any significant length of time, that her symptoms included "severe fluctuations in mood," that at times she became "very isolative" and stayed "in bed for days," that it was "difficult for her to function on a daily basis," and that she was "unable to cope effectively with stress." Tr. 384.

The undersigned agrees Ms. Paulus' opinion could provide some support for a finding that she met or equaled Listing 12.04C.2.  In addition, as discussed above, the undersigned also agrees that under SSR 06-03p, the ALJ's evaluation of that opinion was improper.  Also as discussed above, however, it was not entirely clear that the ALJ was fully aware of her duty to apply the factors set forth in SSR 06-03p, as that ruling was made effective only one day prior to the date of the ALJ's decision.  As such, the undersigned found it proper to remand this matter for further consideration of Ms. Paulus's opinion under SSR 06-03p.

---

[5]With respect to each mental disorder contained in the Listings, 20 C.F.R. Part 404, Subpart P, Appendix 1, §12.00A states: "Each listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). There are additional functional criteria (paragraph C criteria) in 12.02, 12.03, 12.04, and 12.06 . . . We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied."

In so finding, the undesigned noted that it was not certain the ALJ would be required to adopt Ms. Paulus's opinion.  For the same reason, the record does not necessarily support a finding at this time that her opinion supports a finding that Listing 12.04C.2 has been met or equaled here.

III.    The ALJ Erred in Assessing Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination.  Allen, 749 F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

The ALJ discounted plaintiff's credibility because although she claimed she had work in a number of short-term jobs, her work history reflected at least four of those jobs lasted for more than six months. Tr. 18.  Plaintiff argues this was not a valid reason for discounting her credibility, because those jobs occurred prior to October 1, 2002, her alleged onset date of disability, and thus have little bearing on her symptoms and limitations thereafter.  While, as noted above, a claimant's work history may be considered by the

ALJ, it still must be relevant to the period at issue.  Given that the jobs to which the ALJ referred all took place prior to the alleged period of disability (see Tr. 76), they are of questionable relevance.  Accordingly, the undersigned finds the ALJ erred in discounting plaintiff's credibility for this reason.

The ALJ also discounted plaintiff's credibility for the following reasons:

> Despite her impairments, the claimant has been able to engage in extensive daily activities, including housework, shopping, going to church, traveling to Salem about once a month to visit her parents, doing crafts, gambling at a casino, using a computer, doing laundry, driving, reading, and caring for her children.

Tr. 18.  To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7.  The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id.

Plaintiff argues this reason for discounting her credibility was improper, because none of the above activities are inconsistent with her testimony that she is unable to handle work-related stress and maintain regular work attendance.  Plaintiff further argues the ALJ erred in failing to consider her testimony that she is much more limited in her daily activities when her depression worsens, or that she can barely sleep when she becomes manic.  With respect to this last claim, the mere fact that plaintiff cannot sleep does not itself show she is unable to engage in the activities listed by the ALJ.  Indeed, the record contains evidence that plaintiff may be able to engage in a much higher level of activity due to her increased energy (Tr. 95, 104, 107, 110, 430-31, 433), though some evidence does indicate otherwise (Tr. 88, 248).

On the other hand, the undersigned agrees the ALJ's assessment of plaintiff's daily activities do not accurately reflect her overall ability to perform those activities as shown by the evidence in the record.  For example, as pointed out by plaintiff, she has reported being much less active or able to engage in activities of daily living when her depression worsens. See Tr. 103-09, 112, 248, 250, 430-33.  Others who know plaintiff also have reported this to be the case, or that she often needs assistance from others in completing those activities. See Tr. 86-89, 91, 93-99.  In addition, as plaintiff points out, the activities listed by the ALJ are not necessarily indicate plaintiff is able to maintain workplace attendance or handle workplace stress.  The undersigned, therefore, finds the ALJ here too erred in discounting plaintiff's

1   credibility on the basis of her daily activities.

2   The ALJ next discounted plaintiff's credibility in part because her medical treatment had been

3   "conservative" and she had sought "only minimal treatment for her pain complaints." Tr. 18.  Plaintiff

4   argues this is not a convincing reason for discounting her credibility, as none of the treating or examining

5   medical sources in the record have questioned the appropriateness of her treatment regimen.  The Ninth

6   Circuit, however, has found a lack of consistent, or the failure to seek, treatment may constitute a proper

7   basis for calling into question a claimant's pain or symptom complaints. See Fair v. Bowen, 885 F.2d 597,

8   603 (9th Cir. 1989); Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) (upholding ALJ's discounting of

9   claimant's credibility in part due to lack of consistent treatment, and noting fact that claimant's pain was

10  not sufficiently severe to motivate her to seek treatment, even if she had sought some treatment, was

11  powerful evidence regarding extent to which she was in pain); Meanal v. Apfel, 172 F.3d 1111, 1114 (9th

12  Cir. 1999) (ALJ properly considered claimant's failure to request serious medical treatment for supposedly

13  excruciating pain).  As such, the undersigned finds the ALJ did not err here.

14  Lastly, the ALJ discounted plaintiff's credibility for the following reason:

15  She has not consistently complied with medical treatment and medications.  Prior to her
    overdose, she had decreased her medications (Exhibit 12F-129).  Following her
16  overdose she discontinued group treatment after only 2 days (Exhibit 9F-95).

17  Tr. 18.  Failure to assert a good reason for not following a prescribed course of treatment, or a finding that

18  a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain testimony."

19  Fair, 885 F.2d at 603.  Plaintiff argues other than the one time noted above when she decreased her

20  medications, there is no evidence in the record to support the ALJ's assertion regarding non-compliance.

21  Plaintiff also argues she stopped attending group therapy not because she no longer wanted to be in

22  therapy, but because she preferred individual therapy to which she ended up returning. See Tr. 427.

23  With respect to this last issue, the discontinuance of group therapy, the undersigned finds the ALJ

24  erred in discounting plaintiff's credibility for that reason.  Changing from group to individual therapy does

25  not impugn plaintiff's credibility.  Certainly, it cannot be uncommon for a mental health patient to prefer

26  individual to group therapy given the personal nature of the information likely to be shared in a therapeutic

27  atmosphere.  This would appear to be particularly true with someone like plaintiff, whom the record shows

28  has had significant issues dealing with other people.  Accordingly, the undersigned finds this stated reason

1    for discounting plaintiff's credibility to have been improper.

2        The undersigned also finds the ALJ improperly discounted plaintiff's credibility on the basis that

3    she had decreased her medications prior to her overdose.  As noted by plaintiff, this is the only instance of

4    such a decrease that the ALJ mentioned.  Also as noted by plaintiff, she testified that around the time of

5    her overdose, she "got mixed up" on what she was supposed to take due to the fact that her medications

6    were being changed. Tr. 426.  Indeed, nothing in the mental health treatment record noting the fact that

7    plaintiff had decreased her medications indicated that she did so due to any desire not to comply with

8    recommended treatment.  See Tr. 266.  Nor does there appear to be any indication elsewhere in the record

9    that plaintiff has decreased her recommended dose of medication contrary to treatment recommendations.

10        While, as discussed above, not all of the ALJ's stated reasons for discounting plaintiff's credibility

11    were improper, the majority of them were.  An ALJ's credibility determination is not valid if unsupported

12    by substantial evidence in the record, even though some of the reasons for discounting the testimony of the

13    claimant may be valid. Tonapetyan, 242 F.3d at 1148.  Such is the case here.

14    IV.    The ALJ's Evaluation of the Lay Witness Evidence in the Record

15        Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into

16    account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to

17    each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay

18    testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.

19    1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In

20    rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons"

21    for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to

22    those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ

23    also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

24        With respect to the lay witness evidence in the record, the ALJ found as follows:

25        Vicki Simonsen, the claimant's mother, reports she needs reminders to eat and take
        medications.  She prepares simple meals but no longer entertains friends and family.

26        When she feels good she does housework but her husband and children do a lot of it.
        She was unable to manage a checking account due to manic swings and depression.

27        She goes to church, but not as much as she used to.  She can become irritable and
        irrational.  She has trouble with memory and concentration.  She can walk a block or

28        two before resting. (Exhibit 4E).  Jared Williams, the claimant's husband, reports that
        on a good day she gets the children ready for school, attends appointments, and makes

dinner.  On bad days she stays in bed much of the time.  He does most of the cooking.
She does laundry, cleaning and vacuuming but it may take all day to do one chore.  If
she is having a bad day or week, he and the children do the housework.  She shops for
food and clothes.  She misses about 50% of weekly meetings at church. (Exhibit 5E).

The allegations of Ms. Simonsen and Mr. Williams are not consistent with the medical
evidence of record.  On mental status examination the claimant exhibited no memory or
concentration deficits. (Exhibit 10F).  Despite her impairments, the claimant has been
able to engage in extensive daily activities, including housework, shopping, going to
church, traveling to Salem about once a month to visit her parents, doing crafts,
gambling at a casino, using a computer, doing laundry, driving, reading, and caring for
her children.  Treatment records reflect good response to Flexeril in terms of her pain
complaints (Exhibits 8F-77, 13F-146).  Counseling records reflect good mood stability
with use of medication (Exhibit 20F-238).

Tr. 18.

Plaintiff argues the ALJ erred in rejecting the statements of Ms. Simonsen and Mr. Williams as not

being consistent with the medical evidence in the record, which she asserts, when considered in its

entirety, is fully consistent with their statements.  While plaintiff does not point to anything in the record to

support her assertion, the undersigned agrees the ALJ erred in so finding here.  Although plaintiff's

concentration and memory in general were found to be intact on examination (see Tr. 248, 250-51, 366),

other medical evidence in the record indicates at least some problems with concentration (see Tr. 148, 162,

384).  There is some evidence, furthermore, that plaintiff's bipolar disorder symptoms may cause

additional significant limitations when active. See Tr. 148-49, 252, 384.  As such, the undersigned finds

the medical evidence in the record does not clearly contradict the lay witness statements.

In addition, as discussed above, the evidence in the record shows that plaintiff's activities of daily

living have not at all times been as extensive as the ALJ described, again particularly during those periods

when plaintiff's depression reportedly has worsened.  Thus, this too is not clearly a germane reason for

rejecting the statements of the above two lay witnesses.  With respect to plaintiff's good pain response to

Flexeril, the statements provided by Ms. Simonsen and Mr. Williams relate primarily to plaintiff's mental,

as opposed to, physical functioning, and thus is of limited relevance here.

On the other hand, as discussed above, the medical evidence in the record does show overall that

plaintiff experienced good mood stability with use of medication.  The undersigned finds this evidence to

be germane to the lay witness evidence discussed herein.  As discussed above, the rejection of lay witness

testimony is subject to much less strict standards than the rejection of medical source opinions or claimant

testimony.  That is, the ALJ need only provide a "germane" reason for doing so.  As such, the undersigned

1  finds the ALJ did this here, and thus did not err in discounting the statements of either Ms. Simonsen or

2  Mr. Williams with respect to plaintiff's mental functioning.

3  V.    The ALJ Erred in Assessing Plaintiff's Residual Functional Capacity

4      If a disability determination "cannot be made on the basis of medical factors alone at step three of

5  the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

6  assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

7  claimant's residual functional capacity assessment is used at step four to determine whether he or she can

8  do his or her past relevant work, and at step five to determine whether he or she can do other work. Id.  It

9  thus is what the claimant "can still do despite his or her limitations." Id.

10      A claimant's residual functional capacity is the maximum amount of work the claimant is able to

11  perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

12  must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only

13  those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

14  claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

15  related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

16  medical or other evidence." Id. at *7.

17      Here, the ALJ assessed plaintiff with the following residual functional capacity:

18      . . . [T]he claimant has the residual functional capacity to lift 20 pounds occasionally
        and 10 pounds frequently.  She can stand and walk 6 hours out of an 8-hour day and sit
19      6 hours out of an 8-hour day.  She should avoid concentrated exposure to fumes, odors,
        dusts, gases, and poor ventilation.  She can do simple and detailed tasks not involving
20      much interaction with the public and involving a low level of pressure in terms of
        social interaction and production requirements.
21
22  Tr. 17. Plaintiff argues that based on the medical opinion evidence from Ms. Paulus and Dr. McVay, the

23  ALJ's residual functional capacity assessment should have contained the limitation that plaintiff is unable

24  to handle the stress of regular, full-time competitive employment.  Certainly, this in essence was what Ms.

25  Paulus found.  Dr. McVay also opined that if plaintiff's reported diagnosis and history could be confirmed

26  by Ms. Paulus, he would expect someone with plaintiff's profile to be severely impaired in her ability to

27  maintain a job.  As discussed above, however, it is not clear that the ALJ would be required to adopt the

28  opinion of Ms. Paulus under the factors set forth in SSR 06-03p.  As such, it also is unclear at this point

    whether the ALJ would be required to incorporate that opinion, and, accordingly, that of Dr. McVay into

1   her assessment of plaintiff's residual functional capacity.

2          Plaintiff also argues the medical opinion evidence from Drs. Sparling, Barlow and Magaret can

3   only support a finding that she is physically unable to perform full-time work due to pain and fatigue

4   related to her fibromyalgia.  As discussed above, however, the ALJ did not err in evaluating the findings

5   and opinions from Dr. Sparling and Dr. Barlow.  In addition, while also as discussed above, the medical

6   evidence from Dr. Magaret should be re-considered on remand, given that the ALJ gave at least one valid

7   reason for rejecting that evidence, again it is not clear the ALJ was required to adopt all of Dr. Magaret's

8   findings or to include them in plaintiff's residual functional capacity assessment.

9          Plaintiff next argues that her own testimony and the statements of the lay witnesses in the record

10  are fully consistent with the opinions of her treating and examining physicians.  Although plaintiff

11  certainly is alleging that she is incapable of working and thus disabled, it is unclear the symptoms and

12  limitations the two lay witnesses reported observing are completely consistent with that level of severity.

13  Even if they are, though, given that it is not clear the ALJ would be required to adopt the limitations

14  plaintiff argues the above medical sources found or to include them in her residual functional capacity

15  assessment, the same must be said with respect to this evidence as well.

16         Lastly, plaintiff argues the ALJ failed to properly consider the mental functional limitations Bruce

17  Eather, Ph.D., and Timothy Gregg, Ph.D., two non-examining psychologists, found in late December 2004,

18  and early July 2005, respectively.  Specifically, Drs. Eather and Gregg found plaintiff to be moderately

19  limited in her ability to perform activities within a schedule, maintain regular attendance, be punctual,

20  complete a normal workday and workweek, perform at a consistent pace, interact appropriately with the

21  general public, respond appropriately to changes in the work setting, and set realistic goals or make plans

22  independently of others. Tr. 148-49.  Dr. Eather and Dr. Gregg also found as follows in relevant part with

23  respect to plaintiff's specific mental functional limitations:

24         . . . She is capable of performing simple and complex tasks and persisting for 2 hours.

25         . . . She is able to relate appropriately to a supervisor and a few co-workers in a non-
              public setting.

26

27         . . . She is able to drive a car and travel independently as well as be aware of normal
              hazards and take appropriate precautions.

28  Tr. 150.

1    The ALJ gave "significant weight" to the findings of Dr. Eather and Dr. Gregg, noting that they

2  were "consistent with the treatment record." Tr. 20.  Plaintiff argues that while the ALJ made this finding,

3  she failed to include all of the limitations found by Drs. Eather and Gregg in the assessment of her residual

4  functional capacity.  The undersigned agrees.  While the ALJ does appear to have adopted some of those

5  limitations, such as regarding performance of tasks and interaction with the public, she failed to discuss

6  many of the other limitations found by Dr. Eather and Dr. Gregg, or state why she did not include them in

7  her assessment of plaintiff's residual functional capacity.  As such, the ALJ erred.

8  VI.    The ALJ's Step Five Analysis

9    If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

10  process the ALJ must show there are a significant number of jobs in the national economy the claimant is

11  able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), §

12  416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to the

13  Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock

14  v. Apfel, 240 F.3d 1157, 1162 (8th Cir. 2000).

15    An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

16  posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

17  1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

18  medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

19  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported

20  by the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from

21  that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th

22  Cir. 2001).

23    Here, the ALJ posed a hypothetical question to the vocational expert containing substantially the

24  same mental and physical limitations as were included in the ALJ's assessment of plaintiff's residual

25  functional capacity. Tr. 438-39.  In response to that hypothetical question, the vocational expert testified

26  that an individual with those limitations would be able to perform other jobs. Tr. 440-42. Based on the

27  testimony of the vocational expert, the ALJ found plaintiff to be capable of performing other jobs existing

28  in significant numbers in the national economy. Tr. 21.

Plaintiff argues the ALJ erred in relying on the vocational expert's testimony to find her capable of performing other jobs existing in significant numbers in the national economy, because the hypothetical question posed did not contain all of her limitations.  Specifically, plaintiff asserts the limitation that she would miss at least two days of work per month as a result of her impaired stress tolerance, and that she is unable to work for more than a six-hour day should have been included therein.  With respect to the first limitation, plaintiff has not pointed to, and a review of the record fails to reveal, any medical source who expressly has found such a limitation.  Plaintiff insists that this limitation is consistent  with other medical evidence in the record.  That, however, remains to be seen on remand.

As to the second limitation, it is true, as discussed above, that Dr. Magaret found plaintiff would not able to work for more than a six-hour day.  Also as discussed above, however, it is appropriate for this matter to be remanded in part for the purpose of re-considering Dr. Magaret's findings.  As such, here too it is premature to determine whether or not the ALJ would be required to adopt that limitation.  While the ALJ did err here at step five of the disability evaluation process, therefore, remand for re-consideration of the ALJ's findings at that step is more appropriate as explained in greater detail below.

VII.    This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because issues remain in regard to the medical evidence in the record, plaintiff's credibility, her residual functional

1   capacity, and her ability to perform other work existing in significant numbers in the national economy,

2   this matter should be remanded to the Commissioner for further administrative proceedings.

3        It is true that where the ALJ has failed "to provide adequate reasons for rejecting the opinion of a

4   treating or examining physician," that opinion generally is credited "as a matter of law." Lester, 81 F.3d at

5   834 (citation omitted).  However, where the ALJ is not required to find the claimant disabled on crediting

6   of evidence, this constitutes an outstanding issue that must be resolved, and thus the Smolen test will not

7   be found to have been met.  Bunnell v. Barnhart, 336 F.3d 1112, 1116 (9th Cir. 2003).  Further, "[i]n cases

8   where the vocational expert has failed to address a claimant's limitations as established by improperly

9   discredited evidence," the Ninth Circuit  "consistently [has] remanded for further proceedings rather than

10  payment of benefits." Bunnell, 336 F.3d at 1116.

11       For the reasons set forth above, the undersigned finds it is not clear the ALJ was required to find

12  plaintiff disabled based on the medical opinion evidence in the record discussed previously, nor has that

13  evidence been fully addressed by a vocational expert.  As such, remand for further proceedings rather than

14  an outright award of benefits is proper here.

15       It also is true the Ninth Circuit has held that remand for an award of benefits is required where the

16  ALJ's reasons for discounting the claimant's credibility are not legally sufficient, and "it is clear from the

17  record that the ALJ would be required to determine the claimant disabled if he had credited the claimant's

18  testimony." Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003).  The Court of Appeals in Connett went

19  on to state, however, it was "not convinced" the "crediting as true" rule was mandatory. Id.  Thus, at least

20  where findings are insufficient as to whether a claimant's testimony should be "credited as true," it appears

21  the courts "have some flexibility in applying" that rule. Id.; but see Benecke v. Barnhart, 379 F.3d 587,

22  593 (9th Cir. 2004) (applying "crediting as true" rule, but noting its contrary holding in Connett).

23       In Benecke, the Ninth Circuit held the ALJ not only erred in discounting the claimant's credibility,

24  but also with respect to the evaluations of her treating physicians. Benecke, 379 F.3d at 594.  The Court of

25  Appeals credited both the claimant's testimony and her physicians' evaluations as true. Id.  It also was

26  clear in that case that remand for further administrative proceedings would serve no useful purpose and

27  that the claimant's entitlement to disability benefits was established. Id. at 595-96.  Such is not the case

28  here.  As discussed above, issues still remain to be resolved on remand with respect to the medical

evidence in the record, plaintiff's residual functional capacity, and her ability to perform other work.

REPORT AND RECOMMENDATION
Page - 25

CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **April 4, 2008**, as noted in the caption.

DATED this 7th day of March, 2008.

Karen L. Strombom
United States Magistrate Judge